19MAG  6649  ORIGINAL

Approved: _____
        JORDAN ESTES / DREW SKINNER
        Assistant United States Attorneys

Before: THE HONORABLE KEVIN NATHANIEL FOX
        United States Magistrate Judge
        Southern District of New York

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

                                  :   **SEALED COMPLAINT**

        - v. -                    :   Violations of
                                      7 U.S.C. §§ 9(1) and
                                      13(a)(5); 17 C.F.R. § 180.1;
JON BARRY THOMPSON,               :   18 U.S.C. §§ 1343 and 2.
    a/k/a "J. Barry Thompson,"
                                  :   COUNTY OF OFFENSES:
        Defendant.                    NEW YORK
                                  :

- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        BRANDON RACZ, being duly sworn, deposes and says that he is a
Special Agent with the Federal Bureau of Investigation, and charges
as follows:

## COUNT ONE
### (Commodities Fraud)

        1.    From in or about June 2018 through in or about July 2018,
in the Southern District of New York and elsewhere, JON BARRY
THOMPSON, a/k/a "J. Barry Thompson," the defendant, as principal of
Volantis Escrow Platform LLC ("Volantis Escrow"), willfully and
knowingly, used and employed, and attempted to use and employ, in
connection with a contract of sale of a commodity in interstate
commerce, a manipulative and deceptive device and contrivance, in
contravention of Title 17, Code of Federal Regulations, Section
180.1, by: (1) using and employing, and attempting to use and
employ, any manipulative device, scheme, and artifices to defraud;
(2) making, and attempting to make, any untrue or misleading
statement of a material fact and omitting to state a material fact
necessary in order to make the statements made not untrue or
misleading; and (c) engaging, or attempting to engage in any act,
practice, and course of business which operates and would operate
as a fraud and deceit upon any person, to wit, THOMPSON made false
statements to representatives of a company ("Company-1") in order
to induce Company-1 to wire millions of dollars to Volantis Escrow

in connection with the sale of Bitcoin.

(Title 7, United States Code, Sections 9(1) and 13(a)(5); Title 17, Code of Federal Regulations, Section 180.1; Title 18, United States Code, Section 2.)

## COUNT TWO
### (Commodities Fraud)

2.   From in or about July 2018 through in or about August 2018, in the Southern District of New York and elsewhere, JON BARRY THOMPSON, a/k/a "J. Barry Thompson," the defendant, as principal of Volantis Escrow, willfully and knowingly, used and employed, and attempted to use and employ, in connection with a contract of sale of a commodity in interstate commerce, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using and employing, and attempting to use and employ, any manipulative device, scheme, and artifices to defraud; (2) making, and attempting to make, any untrue or misleading statement of a material fact and omitting to state a material fact necessary in order to make the statements made not untrue or misleading; and (c) engaging, or attempting to engage in any act, practice, and course of business which operates and would operate as a fraud and deceit upon any person, to wit, THOMPSON made false statements to representatives of a company ("Company-2") in order to induce Company-2 to wire millions of dollars to Volantis Escrow in connection with the sale of Bitcoin.

(Title 7, United States Code, Sections 9(1) and 13(a)(5); Title 17, Code of Federal Regulations, Section 180.1; Title 18, United States Code, Section 2.)

## COUNT THREE
### (Wire Fraud)

3.   From in or about June 2018 through in or about July 2018, in the Southern District of New York and elsewhere, JON BARRY THOMPSON, a/k/a "J. Barry Thompson," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, THOMPSON, through interstate emails and financial tranfers, carried out a scheme to defraud Company-1 by inducing Company-1 to wire millions of dollars

to Volantis Escrow by making false statements to representatives of Company-1 with respect to a Bitcoin transaction.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FOUR
## (Wire Fraud)

4.      From in or about July 2018 through in or about August 2018, in the Southern District of New York and elsewhere, JON BARRY THOMPSON, a/k/a "J. Barry Thompson," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, THOMPSON, through interstate emails and financial transfers, carried out a scheme to defraud Company-2 by inducing Company-2 tó wire millions of dollars to Volantis Escrow by making false statements to representatives of Company-2 with respect to a Bitcoin transaction.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5.      I have been a Special Agent with the FBI For approximately four years.  I am currently assigned to a squad that investigates white collar crimes, including complex financial and securities and commodities fraud crimes.  I have participated in investigations of such offenses, and have made and participated in arrests of individuals who have committed such offenses.

6.      The information contained in the Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including, but not limited to: (a) bank records, telephone records, and records of electronic communications, including text messages and messages over other messaging platforms; (b) publicly available documents; (c) conversations with, and reports of interviews with, non-law enforcement witnesses; and (d) conversations with, and reports prepared by, other agents.  Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and

3

the actions and statements of and conversations with others are reported herein, they are reported in substance and in part. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## BACKGROUND ON CRYPTOCURRENCY

7.    Bitcoin is a form of cryptocurrency, which is a decentralized, peer-to-peer form of electronic currency. Cryptocurrency is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange; (2) a unit of account; and/or (3) a store of value, but does not have legal tender status. Unlike "fiat currency," like the U.S. dollar and the Euro, cryptocurrency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency.

8.    Cryptocurrencies like Bitcoin are held by their owners in electronic "wallets." These wallets have unique addresses, which are designated by a string of letters and numbers. Only an individual who possesses the unique "private key" associated with a wallet's address can access the cryptocurrency in that wallet. However, any individual can send cryptocurrency to any wallet. An individual does not have to submit any identifying information to any central authority to own a wallet, and it is therefore very easy to hold a wallet anonymously.

9.    A blockchain is a public, distributed electronic ledger. Whenever someone transfers cryptocurrency between wallet addresses, it is recorded on a blockchain. The blockchain only records the movement of cryptocurrency between the addresses; it does not by itself identify the holders of the cryptocurrency. The blockchain primarily involved in this case is the Bitcoin blockchain.

10.    Under Title 7, United States Code, Section 1a(9), a "commodity" includes "all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." This includes virtual currencies such as Bitcoin.

## RELEVANT PERSONS AND ENTITIES

11.    Based on my review of publicly available information, testimony from an arbitration proceeding, emails, and documents produced by Company-1, and my conversations with representatives of Company-1, I have learned the following, in substance and in part:

4

a.     Volantis Escrow purports to be a Delaware limited liability company, but there is no record of Volantis Escrow being registered in Delaware.  Volantis Market Making LLC ("Volantis Market Making") is a Delaware limited liability company. Collectively, Volantis Escrow and Volantis Market Making are referred to herein as the "Volantis Entities."  The Volantis Entities principally operate out of Pennsylvania.

b.     JON BARRY THOMPSON, a/k/a "J. Barry Thompson," the defendant, is the principal of the Volantis Entities.

c.     Company-1 is a Delaware limited liability company with offices in New York, New York and New Jersey.  Company-1 conducts over-the-counter cryptocurrency transactions, i.e., Company-1 buys large amounts of cryptocurrency from, and sells cryptocurrency to, its customers who prefer to transact with Company-1 rather than buying or selling on a public cryptocurrency exchange.  Company-1's goal is to profit from the spreads—the difference between the buying price and selling price—in those cryptocurrency transactions, rather than from itself taking and holding any position in cryptocurrency.

## THOMPSON'S FRAUD ON COMPANY-1

12.     In sum, in or about June and July 2018, JON BARRY THOMPSON, a/k/a "J. Barry Thompson," the defendant, induced Company-1 to send the Volantis Entities over $3 million to fund the purchase of Bitcoin after falsely assuring Company-1 that THOMPSON had the Bitcoin in hand and Company-1's money could not be lost. After taking Company-1's money and failing to provide any Bitcoin in return, THOMPSON lied for days about why the deal had not worked out and the location of Company-1's Bitcoin and money, which was never returned.

13.     Based on my discussions with representatives of Company-1 and review of emails, messages on the online chat website Telegram, text messages, call records, and bank records, I have learned the following, in substance and in part:

a.     In or about May 2018, the head cryptocurrency trader for Company-1 (the "Company-1 Trader") had a meeting at the office of an individual ("Individual-1") involved in cryptocurrency transactions.  During the meeting, Individual-1 told the Company-1 Trader that he was the representative of a seller of Bitcoin ("Seller-1") and that Seller-1 wanted to use the Volantis Entities as a go-between to sell its Bitcoin, potentially to Company-1.

5

Individual-1 did not disclose the identity of Seller-1 to the Company-1 Trader.

b. On or about June 14, 2018, Individual-1 set up a Telegram chat room for the Company-1 Trader, Individual-1, and JON BARRY THOMPSON, a/k/a "J. Barry Thompson," the defendant. The Company-1 Trader (on behalf of Company-1), THOMPSON (on behalf of the Volantis Entities), and Individual-1 (on behalf of Seller-1) then began negotiating the purchase of Bitcoin by Company-1 from Seller-1 through the Volantis Entities.

c. As reflected in the Telegram messages, the proposal was for Company-1 to purchase large quantities of Bitcoin from Seller-1 through the Volantis Entities. For example, on June 14, 2018, the Company-1 Trader sent Individual-1 and THOMPSON a Telegram message stating "we will be acting buyer on 1k coins a day." Similarly, on June 15, 2018, Individual-1 sent the Company-1 Trader and THOMPSON a message asking THOMPSON to send the Company-1 Trader an agreement "for the 1k+ per day, -3 gross, etc." Based on my discussions with the Company-1 Trader, I understand that "1k" is a reference to 1,000 Bitcoins and "-3" is a reference to a 3% discount from the "spot" Bitcoin price.[1]

d. From the beginning of discussions, the parties contemplated that the Bitcoin purchase would involve an escrow agreement. For example, on or about June 14, 2018, THOMPSON emailed the Company-1 Trader a draft escrow agreement. In addition, that same day, the Company-1 Trader sent THOMPSON and Individual-1 Telegram messages asking "Where is escrow held?" and "I assume fee is paid by seller?" Individual-1 responded "Morgan Stanley" and "yes, seller wil [sic] pay - just for you [first name of the Company-1 Trader]." Based on my involvement in the investigation, I believe that the "fee" is a reference to the fee paid for the use of an escrow agent in the transaction.

e. On or about June 20, 2018, THOMPSON, the Company-1 Trader, another representative of Company-1, who was its Chief Operating Officer (the "Company-1 Representative"), and outside counsel for Company-1 participated in a consensually recorded conference call. Based on my discussions with the Company-1 Trader and the Company-1 Representative, I know that the Company-1 Representative was in New York, New York for the call and the Company-1 Representative was in California for the call. Based on my review of a recording of the call, I have learned that during

---

[1] The "spot" price is the current market price where a commodity may be bought or sold for immediate payment or delivery.

6

the call, THOMPSON falsely assured the Company-1 Trader and the Company-1 Representative that, given the structure of the transaction, there was no settlement risk (i.e., no risk that the transaction would not properly close with the Bitcoin at issue being transferred to Company-1). THOMPSON's false representations on the call included the following:

- "So we custody assets for folks that are trading, needing to trade, doing stuff, and then facilitate the trading. So all we do is process one-sided orders . . . that settle, right, and that way everybody who is a member of the network has full rights and there's no risk of settlement failure." (emphasis added).

- "In addition, when Umm, everything is [in] custody with me before the transaction commences, or it's a breach and the transaction can't start. So cash is with me, coin is with me. So the seller sends coin to me, the cash is with me . . . So the cash and coin are both within our control, and then when the transaction prices, we do an atomic swap."[2] (emphasis added).

Based on my review of relevant documents, my conversations with witnesses, and my training and experience, I believe THOMPSON used the phrase "atomic swap" to refer to THOMPSON instantaneously swapping the "cash and coin" that was in his possession, i.e., transferring the Bitcoin to the Bitcoin buyer and the "cash" to the Bitcoin seller within the Volantis Entities' platform.

      f.   In addition, on the call, the parties discussed a two-agreement structure, where there would be one agreement with the market-making desk (i.e., Volantis Market Making) and one agreement involving Volantis Escrow. THOMPSON proposed:

> And as an alternative, right, we have the market-making desk, which is a separate legal entity, different stakeholders, different everything, right? And if that's easier, we can just—Volantis can act as an escrow wrapper. We have another contract with which is a traditional escrow wrapper, right? And this exact same transaction can be contracted

_____
[2] The quotations included herein are based on draft transcripts of the recorded call.

> through the market-making desk . . . That way they
> can be the intermediaries to make the math work, and
> I can give you our traditional escrow agreement just
> as a wrapper.

Based on my review of relevant documents, my conversations
with witnesses, and my training and experience, I believe
THOMPSON proposed an alternative two-agreement structure
where the counter-party to Company-1 in the Bitcoin
transaction would be Volantis Market Making (instead of
Seller-1), and Volantis Escrow would act as the escrow for
that transaction.

g.      On or about June 21, 2018, the Company-1 Trader sent
THOMPSON and Individual-1 a Telegram message attaching a draft
master purchase agreement. The Company-1 Trader then asked in
another Telegram message if THOMPSON and Individual-1 could "send
escrow asap." Based on my involvement in this investigation and
discussions with the Company-1 Trader, I understand that the
Company-1 Trader was asking THOMPSON and Individual-1 to send a
draft escrow agreement.

h.      On or about June 21, 2018, the Company-1 Trader sent
an email to THOMPSON, which stated, in part: "Please send your
escrow agreement." That same day, THOMPSON replied to the Company-
1 Trader with an email attaching a proposed escrow agreement.

.     i.     On or about June 22, 2018, THOMPSON sent the
Company-1 Trader and Individual-1 a Telegram message regarding the
draft master purchase agreement that stated: "[A certain Volantis
representative] can send over. Changes are to make sure it
complies with our process from the order. Cash and coin both in,
in advance of transaction. Pricing, swap, then release." Based on
my involvement in this investigation, I believe that THOMPSON
informed the Company-1 Trader that he was making changes to the
draft master purchase agreement to reflect that Company-1's "cash"
and Seller-1's Bitcoin would both be in Volantis Escrow's control
before the transaction commenced ("Cash and coin both in, in
advance of transaction"). Based on my involvement in this
investigation, I believe that by stating "[p]ricing, swap, then
release," THOMPSON meant that Volantis Escrow would first determine
the price of the Bitcoin for Company-1, then would swap Company-1's
currency for Seller-1's Bitcoin within Volantis Escrow's platform,
and finally would release the Bitcoin to Company-1 and the currency
to Seller-1.

j.     On or about June 26 to 27, 2018, the Company-1

8

Trader and THOMPSON exchanged Telegram messages about Volantis
Escrow's escrow account. During those messages, the Company-1
Trader repeatedly asked for information on the security of the
escrow account, and THOMPSON falsely assured the Company-1 Trader
that Volantis Escrow would maintain control of the currency
deposited by Company-1, and that no one outside of the Volantis
Entities (except for the third-party wallet custodian service
BitGo[3]) would have access to the wallet containing Seller-1's
Bitcoin before it was released to Company-1. Specifically, they
exchanged the following messages (the Company-1 Trader is referred
to as "Trader"):

> Trader: Due to the nature of you being seller/escrow
> agent at the same time . . . [c]an you
> provide us with any documentation with
> morgan stanley so we can understand our
> security on the escrow with them involved?

> THOMPSON: I thought we were going 5o [sic] make
> [Volantis] market making seller and
> [Volantis] escrow the escrow?

> THOMPSON: Morgan [Stanley] is just an omnibus account.

> THOMPSON: This is why we segmented the transaction.

> Trader: Correct, but its semantics no? You are
> controller of both businesses

> Trader: To be clear, the MPA [master purchase
> agreement] says volantis escrow services . .
> . [n]ot the market making side.

> THOMPSON: Yes, it should say Volantis market making.

> THOMPSON: Slip on lawyers side, I did not share that
> with them. My mistake.

---

[3] Based on my training and experience and my conversations with
witnesses, I understand that BitGo is a cryptocurrency wallet
custodian company that offers services where it holds a customer's
assets in multisignature wallets.

Trader:        I assume you are a beneficial owner of
               volantis market making?

THOMPSON:      Partial, but control is [another
               individual].

Trader:        It creates a conflict of interest so that's
               why we need extra security in the escrow
               agreement

Trader:        Or at least some added language

Trader:        Barry – will the BTC [Bitcoin] be sent to
               our wallet before the cash is sent to the
               seller after the transaction takes place?

Trader:        What transaction takes place first?

Trader:        It's not specified in your escrow contract.

Trader:        Who controls the private key to the wallet
               where the coins are sitting prior to the
               transaction?

Trader:        if you can explain that piece i think we'll
               be good to go.

Trader:        We can sign this mpa [master purchase
               agreement] and do a test trade tomorrow

THOMPSON:      BitGo.  We never have control

Trader:        BitGo custody's the private key which is
               owned by whom?

THOMPSON:      Owned or controlled?  Radically different
               meaning

Trader:        Who has access to the private key prior to
               the trade

THOMPSON:      Everything at bitgo is a multisig
               [multisignature] environment where the keys

10

are segmented between a third-party trustee bitgo and the signatures. And as such . volantis escrow exercises the execution control, the customer does not. Otherwise . you could withdrawal . . . [t]he funds in the middle of a transaction. In addition, we do sometimes support true multisig with the customer, but for this use case that would actually radically slow down the conversation and the transaction.

Trader: So lets say the coin is in a wallet at bitgo, who are the parties involved that must authorize the transaction

THOMPSON: Volantis executes, customer instructs

. . .

Trader: So there is no point where'by the seller can call bitgo and ask for his coins to be moved

THOMPSON: Absolutely not. They have no legal standing to even engage or talk to bitgo in any way shape or form. If they have a login for authorization or other items related to that it's still under the volanta [sic] command-and-control. Under no circumstances Shelly [sic] buyer or seller ever have the ability to impact the transaction or withdrawal assets without volantis is approval.

. . .

Trader: The cash that is moved within the omnibus [Volantis account] - you control right?

Trader: Let's say I don't want to do a trade.

Trader: how do i get my money out of that account.

THOMPSON: You place a withdraw order and it is executed in the next hour of business hours.

Based on my training and experience and my conversations with the Company-1 Trader, in these messages, among other things,

11

THOMPSON reassured the Company-1 Trader that Seller-1, whose identity was unknown to Company-1, could not interfere with the transaction because the Volantis Entities exercised "command-and-control" over the Bitcoin stored in a wallet with BitGo. THOMPSON informed the Company-1 Trader that Seller-1 had no standing to interact with BitGo and did not possess any of the relevant private keys. ("volantis escrow exercises the execution control . . . we do sometimes support true multisig with the customer, but for this use case that would actually radically slow down the conversation and the transaction."). Further, THOMPSON assured the Company-1 Trader that the Volantis Entities also controlled the cash that Company-1 would send to Volantis Escrow, so that if Company-1 decided not to trade before the transaction occurred, Company-1 could simply ask for its money to be returned.

k. On or about June 27, 2018, THOMPSON emailed the Company-1 Trader a Volantis Entities welcome package with wire instructions. Among other things, the welcome package included flow charts to explain what happens to currency transferred into Volantis Escrow's account. The flow charts show that after the customer transfers money into Volantis Escrow's account, Volantis Escrow will confirm receipt and a formal audit trail will be issued showing the customer the current account balance. The flow charts also show that the customer must confirm amounts to be transferred from Volantis Escrow's account. The flow charts do not indicate that currency may be transferred out of Volantis Escrow's account into the accounts of third parties without the customer's approval and without either the Volantis Entities or the customer receiving the Bitcoin.

l. On or about June 27, 2018, the Company-1 Trader emailed THOMPSON an executed version of the Master Purchase Agreement (the "MPA") between Company-1 and Volantis Market Making.

m. On or about June 28, 2018, THOMPSON emailed the Company-1 Trader the counter-executed escrow agreement (the "Escrow Agreement"). Under the Escrow Agreement, Volantis Market Making, as the immediate seller of the Bitcoin, and Company-1, as the buyer, engaged Volantis Escrow to hold and disburse assets in accordance with the terms and conditions of the MPA. Volantis Escrow was to function as a "depository," to facilitate trades between Volantis Market Making and Company-1. The Escrow Agreement further provided that as to escrow fees, "[t]he Parties are liable for the fees set forth in the Master Purchase Agreement."

n. Exhibit A to the Escrow Agreement also set forth the

12

Default Transaction Procedures. It provided that once the fiat currency and Bitcoin are in place, "the transaction commences through the atomic swap process," where the "[Bitcoin] are transferred from the Seller's Volantis account to the Buyer, while simultaneously, [t]he notional Fiat value is transferred from the Buyer's sub account at Volantis to the Seller's Sub account at Volantis."

o.     Based on my conversations with witnesses, my review of the relevant documents, and my training and experience, I know that in this transaction, while Volantis Market Making acted as the "seller" of the Bitcoin pursuant to the agreements, the parties understood that THOMPSON and the Volantis Entities were in fact selling Bitcoin that the Volantis Entities would acquire from Seller-1, the undisclosed third-party represented by Individual-1. Company-1 and THOMPSON had discussed how Company-1 wanted to buy 1,000 Bitcoin per day from Seller-1 and other third-party sellers over the course of multiple transactions. Based on my training and experience and my conversations with witnesses, I know that it is common in the cryptocurrency market for individuals, like THOMPSON and Individual-1, acting on behalf of a seller of cryptocurrency to not disclose that seller's identity to counterparties so that the counterparties cannot contact the seller directly and cut the middlemen, and their fees, out of the transaction.

p.     According to the Default Transaction Procedures, Volantis Escrow would receive cash and cryptocurrency into its respective escrow accounts for Company-1 and Volantis Market Making. The transaction would then be settled "through the atomic swap process." The Escrow Agreement does not indicate that currency may be transferred out of any party's escrow account, or out of the Volantis Entities' control, into the accounts of third parties before the transaction is completed.

q.     In addition, the Escrow Agreement provides that Volantis Escrow "may not assign or delegate its rights or obligations hereunder without the prior written consent of the Parties, which may be withheld in the Parties [sic] sole discretion."

r.     On or about June 28, 2018, THOMPSON emailed the Company-1 Trader an order form for a 100 Bitcoin test purchase by Company-1. Based on historical Bitcoin prices maintained on publicly available web sites, 100 Bitcoin cost approximately $600,000 at the time. Based on my conversations with the Company-1 Trader, the purpose of the test purchase was to confirm that the process of buying Bitcoin through the Volantis Entities worked as

13

expected before engaging in transactions of 1,000 Bitcoin (worth $6 million) per day. The Company-1 Trader later emailed an executed version of the form to THOMPSON.

s.     On or about June 28, 2018, Company-1 wired $650,000 to a Morgan Stanley bank account used by Volantis Escrow (the "Morgan Stanley Account") in order to fund the purchase of 100 Bitcoin.     The Morgan Stanley Account is held in the name of FTL Holding, LLC, which is another company associated with THOMPSON. Based on my review of the account records, I know that THOMPSON was the only authorized signatory on the account.

t.     On or about June 28, 2018, THOMPSON and the Company-1 Trader exchanged text messages about the transaction.     At approximately 3:46 pm, the Company-1 Trader texted THOMPSON:     "On for 5 [pm]?"  THOMPSON responded: "Am tomorrow. Just wrapping up paper on it and have these folks for the larger bits.  One of you primary sellers stepped up to do it in the am for you in advance of the larger tranches.  So you are bundled for am execution."  THOMPSON later sent a text message: "They [the sellers] are loading coin overnight.  I will not run the transaction until I have coin in hand."

u.     On or about Friday, June 29, 2018 — the morning of the scheduled test — THOMPSON and the Company-1 Trader exchanged Telegram messages about the transaction.  Although THOMPSON had previously represented the transaction would take place in the morning, THOMPSON suggested in the messages that he could not complete the transaction in the morning, but that the "2 o'clock slot [was] wide open."

v.     Later that same day, THOMPSON and the Company-1 Trader exchanged text messages about the transaction.  When the Company-1 Trader asked if they were doing the trade at 2 pm, THOMPSON replied "Not at discount. Getting folks to load an unplanned 100 coins at the poo [sic] price today is really difficult.  100 is committed on the order for Monday [July 2] . . ."

w.     Also on or about June 29, 2018, the Company-1 Trader emailed THOMPSON and asked THOMPSON, in sum and substance, for the statement for Company-1's escrow account with Volantis Escrow.

x.     On or about July 1, 2018, THOMPSON emailed the Company-1 Trader and attached a fraudulent "Portfolio Status Report" for the Morgan Stanley Account.  According to the Portfolio Status Report, the Morgan Stanley Account contained, as of June 30,

14

2018, the \$650,000 that Company-1 had sent to Volantis Escrow. However, based on my review of records obtained from Morgan Stanley, I know that the Morgan Stanley Account in fact had a balance of only \$636,380.19 as of June 30, 2018.[4] In other words, Volantis Escrow had already transferred approximately \$14,000 of Company-1's funds out of the Morgan Stanley Account for a use other than executing the 100 Bitcoin transaction.

y.   On or about July 2, 2018, THOMPSON and the Company-1 Trader exchanged text messages about the 100 Bitcoin transaction, which had still not been completed. In one of the messages, THOMPSON stated that the transaction had not gone through because "[p]rice is high and other party does not have enough cash." Based on my review of documents, and my conversations with the Company-1 Trader, I believe that THOMPSON was claiming that another Bitcoin buyer with whom THOMPSON had planned to bundle Company-1's order for 100 Bitcoin in order to purchase a larger amount of Bitcoin at a discounted price did not have enough cash to complete their part of the purchase.

z.   Based on my discussions with the Company-1 Trader, I know that also on July 2, 2018, the Company-1 Trader participated in a phone call with THOMPSON and Individual-1. The Company-1 Trader was in New York, New York, near Company-1's offices, during the call. During the phone call, THOMPSON and Individual-1 told the Company-1 Trader that the Bitcoin transaction needed to involve a minimum of 500 Bitcoins. THOMPSON also told the Company-1 Trader that the Volantis Entities had the Bitcoin in hand.

aa.   Later on or about July 2, 2018, the Company-1 Trader and THOMPSON exchanged additional text messages about the 500 Bitcoin transaction (the Company-1 Trader is referred to as "Trader"):

> Trader:          I don't get why the seller won't
>                  accommodate a 100 lot
>
> Trader:          As a test

---

[4] The Morgan Stanley records show that the Morgan Stanley Account was not used by THOMPSON solely for Company-1's funds; rather it contained multiple other deposits and transfers/withdrawals, including transfers out of the account on June 28 and 29, 2018 in the amounts of \$117,000, \$30,000, and \$20,000. In particular, on June 29, 2018, after receiving Company-1's money, THOMPSON transferred \$20,000 to another account controlled by THOMPSON.

15

| THOMPSON: | on with folks to get backup . . . will call you in 15 |
|---|---|
| Trader: | Hey you have the coin in hand right? |
| Trader: | I will send you the cash for 500 [Bitcoin] |
| Trader: | I want the trade today |
| THOMPSON: | Ok.  Yes |
| THOMPSON: | Ok |
| THOMPSON: | Will start liking it up |
| THOMPSON: | Lining |
| THOMPSON: | Aka kicking the other guy out [smiley face emoji] |
| Trader: | I am unlikely to get it over today though because I have to move money off of exchanges |
| Trader: | And that could take time |
| Trader: | Still Chase for the 400 lot guy concurrently |
| THOMPSON: | Ok.  Understood . . . Ok.  Will line it up for tomorrow |
| THOMPSON: | Will do |

Based on my training and experience and my conversations with the Company-1 Trader, I understand that in this conversation, the Company-1 Trader offered to solve THOMPSON's purported difficulty arranging for another buyer of the remaining 400 Bitcoin by offering to buy the remaining 400 Bitcoin himself. The Company-1 Trader asked THOMPSON to continue pursuing his

other purported buyer to see if the other person could buy the 400 Bitcoin, while the Company-1 Trader obtained the money to fulfill the entire order.

bb. Based on my review of sworn testimony provided by THOMPSON in a deposition, I know that THOMPSON's representation that the Volantis Entities had the coin in hand on or about July 2, 2018 was false. Rather, as THOMPSON admitted in his deposition, he understood the coin to be in the custody of a "sub-escrow agent" who was a lawyer in Florida.

cc. Based on THOMPSON's fraudulent representation that the Volantis Entities had the Bitcoin in hand and his fraudulent representation that he would keep custody of Company-1's cash until there was an "atomic swap" of cash and Bitcoin, on or about July 3, 2018, at approximately 9:28 am, Company-1 wired an additional $2.6 million into the Morgan Stanley Account (bringing the total in the Morgan Stanley Account from Company-1 to $3.25 million). The additional cash was to fund the purchase of the remaining 400 Bitcoin, for a total·of 500 Bitcoin. Based on my discussions with the Company-1 Trader and the Company-1 Representative, I know that Company-1 would not have wired the money if not for THOMPSON's false represensations,··including: (1) his false representation that he had the 500 Bitcoin in hand and (2) his false representations that he would not transfer Company-1's money from the Morgan Stanley Account unless THOMPSON had custody of the Bitcoin.

dd. On or about July 3, 2018, beginning at approximately 12:03 pm, the Company-1 Trader and THOMPSON exchanged emails regarding the expected Bitcoin trade. In particular, in one email, THOMPSON stated "[p]lease see the execution report on the transaction just completed," and then falsely represented that Company-1 had purchased 500 Bitcoins for a total price of $3,191,067.20. In the same email, THOMPSON told the Company-1 Trader that he was sending a test transaction to Company-1's wallet. Based on my training and experience and my conversations with witnesses, I know that it is common for parties in cryptocurrency transactions to send the smallest unit of Bitcoin, .00000001 Bitcoin, before conducting a larger transaction to ensure that the sender entered the destination wallet address (a long string of letters and numbers) correctly and that the counterparty received the test amount.

ee. On or about July 3, 2018, at 2:05 pm, the Company-1 Trader sent THOMPSON an email confirming that Company-1 had received the test transaction. The Company-1 Trader then asked THOMPSON to send the 500 Bitcoin.

17

            ff.   On or about July 3, 2018, at approximately 3:39 pm, the Company-1 Trader sent THOMPSON a message requesting the Bitcoin "immediately." At approximately 3:44 pm, THOMPSON sent the Company-1 Trader an email that said: "[w]e had a white list issue between the two accounts we have internally and have to unlock the white list, which is what I was doing while you were calling. Bitgo is clearing and it will go out." Based on my training and experience and my conversations with witnesses, I know that "white list" in this context refers to a wallet holder pre-approving with a wallet custodian like BitGo only certain recipient wallet addresses so that Bitcoin cannot inadvertently be sent from an owner's wallet at BitGo to other, non-approved addresses.   On or about July 3, 2018, the Company-1 Trader sent additional emails to THOMPSON seeking an update on the status of the transaction.

            gg.   The Volantis Entities did not send the 500 Bitcoin to Company-1's wallet on July 3, 2018.  Nor did the Volantis Entities maintain Company-1's cash in the Morgan Stanley Account. Rather, on or about July 3, 2018, the same day Company-1 had sent the Volantis Entities $2.6 million, the Volantis Entities wired approximately $3,090,250 from the Volantis Entities' Morgan Stanley Account to a bank account held by a law firm in Florida.[5]  Also on July 3, 2018, the Volantis Entities transferred approximately $100,000 to another Morgan Stanley account in the name of FTL Holding, LLC (the "Second Morgan Stanley Account").   The $100,000 transferred to the Second Morgan Stanley Account was then wired to the bank account of a separate company with which THOMPSON appeared to have a financial relationship.

            hh.   On or about July 4, 2018, the Company-1 Trader emailed THOMPSON to ask for a time frame for the delivery of the Bitcoin.   That same day, the Company-1 Trader and THOMPSON engaged in a text message conversation about the Bitcoin transaction. During the text message conversation, THOMPSON made several false representations regarding the status of the trade:

- "Issue should be solved, but getting someone into the back office now to get released just taking time since everybody's a few hours out, I have someone driving back to the office so that they can start the release. Not sure what time they're ETA is"

---

[5] Between on or about June 28, 2018, when Company-1 had sent the Volantis Entities approximately $650,000 and July 3, 2018, the Morgan Stanley Account received deposits from other entities.

- "[Two] party release is required. It was fixed overnight."

- "I am making [name of employee] drive 3.5 hours back from camping with her fimily [sic] to put it in th [sic] system as she is the closest and on call for the day. [Transaction will go through] when she is in."

ii. The Volantis Entities did not send the 500 Bitcoin to Company-1's wallet on July 4, 2018.

jj. On or about July 5, 2018, at approximately 7:42 am, the Company-1 Representative emailed THOMPSON to get an update on the transaction. Shortly thereafter, THOMPSON responded that "it is set to clear in the morning batch."

kk. Beginning at approximately 9:29 am on July 5, 2018, THOMPSON and the Company-1 Trader exchanged numerous text messages about the transaction. Fn those messages, in sum and substance; the Company-1 Trader repeatedly inquired about the status of the transaction and THOMPSON provided false reasons for the delay. For example, at one point, THOMPSON stated that he was "on the phone fixing the wallet security item from Tuesday, it's a quick fix . . . Just Just need to reset." In deposition testimony, THOMPSON admitted this statement was not accurate and that he was attempting to buy time.

ll. The Volantis Entities did not send the 500 Bitcoin to Company-1's wallet on July 5, 2018.

mm. From approximately July 6, 2018 to July 8, 2018, THOMPSON continued to represent to Company-1 that the Bitcoin transaction would be completed.

nn. On or about July 9, 2018, Company-1 demanded that the Volantis Entities return 50% of the $3.25 million Company-1 wired to the Morgan Stanley Account. That same day, in a text message to the Company-1 Trader, THOMPSON represented that Company-1 would receive the money back "this afternoon." No money was returned to Company-1 that day.

oo. On or about July 10, 2018, THOMPSON emailed the Company-1 Trader and stated: "[first name of the Company-1 Trader] as I indicated around 1 pm you will get the wire today as soon as we process the items we discussed."

19

pp.   The $3.25 million that Company-1 sent to the Morgan
Stanley Account in total was never returned to Company-1, nor did
Company-1 ever receive the 500 Bitcoin it attempted to purchase.
On or about July 17, 2018, Company-1 filed an arbitration
proceeding against the Volantis Entities.

qq.   In his arbitration hearing testimony, THOMPSON
testified that he sent Company-1's money to a "sub-escrow account"
controlled by a lawyer in Florida.  THOMPSON testified that the
lawyer, in turn, failed to return Company-1's money to the Volantis
Entities or send any Bitcoin.

## THOMPSON'S FRAUD ON COMPANY-2

14.   Based on my review of deposition testimony, emails, text
messages, bank records, and contracts produced by Company-2, as
well as my interviews of the Chief Executive Officer and the Chief
Operating Officer of Company-2 (the "Company-2 CEO" and the
"Company-2 COO"), I have learned the following, in substance and in
part:

a.   In sum, in or about July 2018, JON BARRY THOMPSON,
a/k/a "J. Barry Thompson," the defendant, induced Company-2 to send
the Volantis Entities over $4 million to fund the purchase of
Bitcoin based on false representations.  After receiving Company-
2's money, THOMPSON sent a substantial portion of the money to a
third party—about whom THOMPSON was aware of several warning signs—
without first receiving any Bitcoin in return.  THOMPSON never
provided Company-2 with any Bitcoin, nor did he return Company-2's
money.  THOMPSON also lied to Company-2 about the location of the
Bitcoin and the reasons the transaction was not completed.

b.   Company-2 is a business based in Ireland that trades
cryptocurrency.

c.   In or about March 2018, the Company-2 CEO was
introduced to THOMPSON by another individual ("Individual-2").
The introduction was made over a conference call.  Individual-2
works as a middleman, who introduced buyers and sellers of
Bitcoin.  During that first call, THOMPSON provided a high level
overview of how the Volantis Entities operated as an escrow
agent to eliminate counterparty risk in cryptocurrency
transactions.

d.   On or about May 24, 2018, THOMPSON emailed the
Company-2 CEO documents that provided an overview of the
Volantis Entities.  The overview documents represented that

20

Volantis Escrow "provides a global framework of accounts and transaction facilitation infrastructure that minimizes settlement default risk and delays regulatory complexity" (emphasis added). The overview documents further represented that because Volantis Escrow is "asset custodian for the both sides of the transaction, there is no risk of default" (emphasis added). Finally, the overview documents noted that transactions "are pre-funded and typically settle in real-time."

e.     In or about July 2018, the Company-2 CEO and THOMPSON began negotiating a cryptocurrency transaction where Volantis Escrow would act as an escrow agent. On or about July 14, 2018, THOMPSON told the Company-2 CEO that he had two sellers available and that he was loading the sellers' Bitcoin onto his platform.

f.     On or about July 20, 2018, Company-2 and Volantis Escrow entered into an Escrow Services Agreement (the "Company-2 Escrow Agreement"). Under the Company-2 Escrow Agreement, Company-2 engaged Volantis Escrow to hold and disburse assets for Company-2 at Company-2's direction. The Company-2 Escrow Agreement provided that Volantis Escrow will receive a one-time escrow fee of 1.5% of each asset deposited with Volantis Escrow. The Company-2 Escrow Agreement further provided for additional monthly fees at a minimum of $2,500.

g.     The Company-2 Escrow Agreement does not indicate that currency may be transferred out of any party's escrow account into the accounts of third parties before a transaction is completed. It expressly provides that Volantis Escrow "may not assign or delegate its rights or obligations hereunder without the prior written consent of Customer, which may be withheld in Customer's sole discretion."

h.     On or about July 23, 2018, THOMPSON emailed the Company-2 CEO and the Company-2 COO a welcome package outlining the way orders are processed by the Volantis Entities. The welcome package included wire instructions, which stated that funds were to be wired through a Citibank account in New York, New York.

i.     On or about July 23, 2018, THOMPSON and the Company-2 CEO discussed the transaction over the phone. THOMPSON told the Company-2 CEO, in sum and substance, that he had the seller's Bitcoin in his possession. The Company-2 CEO had made clear to THOMPSON in prior conversations that Company-2 would transact with the Volantis Entities only if the Bitcoin

21

was in the Volantis Entities' possession, and THOMPSON agreed to this arrangement.

j.     Separately, on or about July 23, 2018, THOMPSON emailed a cryptocurrency broker ("Individual-3") to discuss a "dual handshake" transaction involving the purchase of Bitcoin from another company ("Seller-2"). Based on my review of later emails, I believe this is the Bitcoin that THOMPSON purported he would sell to Company-2. In THOMPSON's email with Individual-3, THOMPSON outlined the process for his planned purchase of the Bitcoin from Seller-2. THOMPSON's email stated that the Volantis Entities would transfer the funds (i.e., what ultimately were Company-2's funds) to purchase the Bitcoin to a third-party escrow (the "Third-Party Escrow") before the Third-Party Escrow would send the Bitcoin to the Volantis Entities on behalf of Seller-2. THOMPSON's plan to buy Bitcoin (for Company-2) by sending Company-2's funds to a Third-Party Escrow before the Third-Party Escrow provided Seller-2's Bitcoin to the Volantis Entities was directly contrary to THOMPSON's assurances to Company-2 that its funds would not be transferred until the Bitcoin was in the control of the Volantis Entities.

k.     On or about July 24, 2018, THOMPSON and Seller-2 entered into a contract for Volantis Escrow to purchase Bitcoin from Seller-2 (the "Sales Contract"). Under the Sales Contract, Volantis Escrow agreed to purchase tranches of Bitcoin from Seller-2 on a weekly basis, at a 6% discount. The Sales Contract provided that the first tranche would be for 500 Bitcoin, with additional tranches to be decided one week in advance. The Sales Contract provided that all payments from Volantis Escrow for the Bitcoin were to be paid out of its Morgan Stanley Account in New York, New York. An appendix to the Sales Contract provided that the Third-Party Escrow would act as an escrow agent for the transactions.

l.     On or about July 24, 2018, THOMPSON received an email with documents attaching background information on the Third-Party Escrow and an individual associated with the Third-Party Escrow ("Individual-4"). The email stated "not good results." The documents showed a number of red flags associated with the Third-Party Escrow and Individual-4, including that Individual-4 had a history of bankruptcy and was associated with multiple social security numbers. THOMPSON later forwarded the background information on Individual-4 to another individual with his own comment: "This is an example of someone we don't want to do business with."

22

m.    On or about July 24, 2018, THOMPSON emailed the Company-2 CEO with the wallet address for the source of Bitcoin that would be sold to Company-2.

n.    Also on or about July 24, 2018, THOMPSON emailed the Company-2 COO with a block order form for Bitcoin transactions.  The block order form provided that the order would be for the purchase of up to 6,600 Bitcoin, on a schedule of 500 Bitcoin a day for the week of July 23rd, and 1,000 Bitcoin per day for the week of July 30th.  The order form, unlike the similar order form THOMPSON had provided to Company-1 in June 2018 and which had resulted in an arbitration proceeding filed against THOMPSON days prior, further provided that the transaction was a "multi-escrow execution managed by Volantis. All proceeses fit within the process structure outlined above." Above, the order form provided, among other things, that "Volantis validates Fiat Capital and Coin for daily tranche as ready by 7 am ET."  The order form did not explain what a "multi-escrow execution managed by Volantis" was, nor did it state that any money would be transferred out of Company-2's escrow account before the Volantis Entities or Company-2 received any Bitcoin.  In fact, as discussed above, THOMPSON had told the Company-2 CEO that the Volantis Entities already possessed the Bitcoin.

o.    Based on Thompson's representations, including his telling the Company-2 CEO that he already had the Bitcoin in his possession, on or about July 24, 2018, Company-2 executed the block purchase order and wired approximately €3.6 million to Volantis Escrow.  The €3.6 million was wired from a bank in Europe to the Morgan Stanley Account in New York and was received on or about July 25, 2018.

p.    On or about July 25, 2018, THOMPSON emailed the Company-2 CEO and the Company-2 COO to confirm receipt of the €3.6 million.

q.    On or about July 26, 2018, the Company-2 CEO and THOMPSON exchanged the following text messages about the order (the Company-2 CEO is referred to as "CEO"):

> THOMPSON:    [Name of CEO], Please call.  Back office just called and we have a few hour delay in execution this am due to seller availability I need to know how to handle ·(kill/delay/execute).  Please call.

23

CEO:            Feel like killing my myself or Simone
                [smiley face emoji]. Give me a min I had
                just started to move to make the trades.

THOMPSON:       This is why I reaching out as soon as we had
                the alert at 5:30

CEO:            Hi mate, any update on timing?

THOMPSON:       I'll call you right back

CEO:            Getting late and I'm getting really [sad
                face emoji]

THOMPSON:       Me too… I am hammering them now

CEO:            Please tell the seller to sort this. We
                trade tomorrow or I'm more than likely going
                to pull away from this seller. Realize
                other sellers with you and we can discuss
                but messy so far.

Thompson:       Yes. I went there 45 minutes ago

CEO:            Barry, I will be in bed next 30-40 mins.
                Any update on timing?

        r.    On or about July 26, 2018, THOMPSON emailed a
representative of the Third-Party Escrow with a request for
"Know Your Client" ("KYC") information, including details on one
of the Third-Party Escrow's executives. Based on my training
and experience and my involvement in this investigation, I know
that companies in the cryptocurrency space typically obtain KYC
information to run checks on the counterparties to their
transactions. The representative of the Third-Party Escrow
replied to THOMPSON's email that there was "nothing to run" and
that the information provided was "as accurate as it is you are
going to get." THOMPSON forwarded that email to a another
individual involved in the transaction with the comment:
"Warning signs."

        s.    On or about July 27, 2018, the Company-2 CEO
emailed THOMPSON to confirm that Company-2 had accepted a trade
of 500 Bitcoin at the price of €6,607 per Bitcoin. The Company-
2 CEO's email further noted that Company-2 had provided €3.6

                                24

million into the Volantis Entities' escrow account, so, at that price per Bitcoin, its balance would be €296,500.50 after the trade. Later that same day, the Company-2 CEO emailed THOMPSON, stating, among other things, "Address has been reconfirmed via Telegram, including QR." Later that day, THOMPSON responded to the Company-2 CEO and stated "Updated wallet address received." Based on my training and experience, and my discussions with witnesses, I understand that the "wallet address" refers to a wallet held by Company-2 to which Volantis Escrow would transfer the Bitcoin.

t.     On or about July 27, 2018, Volantis Escrow and Seller-2 agreed – without any consultation with Company-2 – that the first trade between Volantis Escrow and Seller-2 would involve 544, rather than 500, Bitcoin, at a total price of $4,024,914.56. On or about July 27, 2018, three days after receiving Company-2's funds, without receiving any Bitcoin from the Third-Party Escrow or Seller-2, and despite the red flags identified by THOMPSON regarding the Third-Party Escrow, the Volantis Entities wired approximately $4,024,914.56 from the Morgan Stanley Account to an account held by the Third-Party Escrow.

u.     THOMPSON did not send all of Company-2's money to the Third-Party Escrow, however. On or about July 27, 2018, THOMPSON had converted €3.5 million of Company-2's €3.6 million into U.S. dollars ($4,066,107.50) and sent all but approximately $40,000 of that money to the Third-Party Escrow. Days later, on or about August 8, 2018, THOMPSON converted the remaining €100,000 of Company-2's money to U.S. dollars (worth $115,620.80) and then transferred $100,000 to THOMPSON's Second Morgan Stanley Account. Just as he had done with Company-1's money, THOMPSON then wired the $100,000 to the same separate company with which THOMPSON appeared to have a financial relationship.

v.     The Volantis Entities did not send the 500 Bitcoin to Company-2's wallet on July 27, 2018.

w.     Beginning on or about July 27, 2018, the Company-2 CEO and THOMPSON exchanged numerous text messages about the status of the order. In those text messages, THOMPSON falsely represented, in sum and substance, that he would be able to release the Bitcoin to Company-2 once a wire transfer made it to the counterparty's account. In one message, THOMPSON stated "I'm just finding out if they received the wire . . . Then I can release." In another text message on or about July 28, 2018, THOMPSON continued making false statements to the Company-2 CEO

25

about the status of the transaction. THOMPSON stated, in sum
and substance, that he was "working the seller outside the
escrow [to] force release" and that "worst case" he would go to
the executives of the mining groups[6] so they could "override
everybody and authorize me to release." On July 30, 2018,
THOMPSON falsely stated in a message to the Company-2 CEO:
"Just got text the key fragments in to start moving to the hot
wallet so we can move out of bitgo. Going to be a few minutes
yet (40 is worst case)." Based on my training and experience, I
believe that in the July 30, 2018 message, THOMPSON was claiming
that he finally had access to the wallets where the coins were
stored so that he could start moving them to Company-2's wallet
within 40 minutes.

        x.    Based on my review of emails and THOMPSON's
testimony in a civil proceeding related to the fraud on Company-
2, I know that these above-described statements were false,
because the Volantis Entities did not have possession of the
Bitcoin at the time, nor the ability to release them to Company-
2.  In multiple emails among THOMPSON and representatives of
Seller-2 between on or about July 27, 2018 and August 6, 2018,
THOMPSON asked Seller-2 to transfer the Bitcoin to a wallet
under THOMPSON's control. Rather than merely seeking
authorization to release the coins to Company-2, in emails on
July 28, and July 30, 2018, THOMPSON asked the seller for "a
timeline of coin fill," and complained that the "deadline on
delivery of Coin" had passed. In an email on July 31, 2018,
THOMPSON noted he had "no performance guarantee," and stated
that he had only a short period of time for the seller to
"deliver coins (or for you [the seller] to acquire them and
prove you have control over them)." Moreover, in testimony in a
civil proceeding in or about October 2018, THOMPSON testified,
contrary to his statements to the Company-2 CEO that he would be
able to release the coins, that the "544 Bitcoin never came" and
that while the counterparty was "to this day" telling THOMPSON
they would "deliver coin," he did not believe it.

        y.    The Volantis Entities still had not sent Company-
2 any Bitcoin by July 31, 2018. On that day, the Company-2 CEO
emailed THOMPSON to ask that THOMPSON either engage in
discussions or return the €3.6 million immediately. The

---

[6] Based on my training and experience, and my involvement in this
investigation, I know that Bitcoin mining is the process of
verifying the ledger of Bitcoin transactions known as the
blockchain, which results in the creation of new Bitcoin.

26

Volantis Entities did not return the money to Company-2 that
day.

z.    The Bitcoin transaction between Company-2 and the
Volantis Entities was never completed.   The Volantis Entities
did not return the €3.6 million, nor any Bitcoin, to Company-2.


WHEREFORE, deponent respectfully requests that a warrant
issue for the arrest of JON BARRY THOMPSON, a/k/a "J. Barry
Thompson," the defendant, and that he be arrested and imprisoned or
bailed, as the case may be.


BRANDON RACZ
Special Agent
Federal Bureau of Investigation


Sworn to before me this
18 day of July, 2019

THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

27